Filed 7/15/13  In re P.A. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **In re P.A., a Person Coming Under the Juvenile Court Law.** | |
| **THE PEOPLE,**<br><br>        **Plaintiff and Respondent,**<br><br>**v.**<br><br>**P.A.,**<br><br>        **Defendant and Appellant.** | **A135422**<br><br>**(Contra Costa County Super. Ct. No. J1200273)**<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT]** |

BY THE COURT:

IT IS ORDERED that the opinion filed on June 14, 2013, is modified as follows and appellant P.A.'s petition for rehearing is DENIED:

1.  On page 4, in the fourth full paragraph, the second sentence is deleted.  The following sentence is inserted in its place:  "He recognized the gun found beneath the driver's seat as the weapon pointed at him."

2.  On page 10, in the second full paragraph, change the word "he" in the third and fourth sentences to the word "she."

1

3. On page 12, in the second full paragraph, the first sentence is deleted. The following sentence is inserted in its place: "Indeed, much of P.A.'s argument rests on inferences that he draws in a manner most supportive of his position, from evidence of police activity occurring at some place and time other than the place and time of P.A.'s consent to the search (albeit in the same parking lot that night)."

4. On page 16, the third sentence of the third paragraph is deleted. The following sentence is inserted in its place: "Here, by contrast, there was no direct evidence that Officer McGraw's firearm was drawn when he asked P.A. permission to search his SUV."

5. On page 18, in the paragraph that carries over from page 17, change "around 1:00 a.m." to "after 11:00 p.m."

The modification effects no change in the judgment.

Date_____        _____P.J.

Filed 6/14/13  In re P.A. CA1/5 (unmodfied version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **In re P.A., a Person Coming Under the Juvenile Court Law.** | |
| **THE PEOPLE,** **Plaintiff and Respondent,** v. **P.A.,** **Defendant and Appellant.** | **A135422** **(Contra Costa County Super. Ct. No. J1200273)** |

P.A. appeals from a dispositional order in a proceeding commenced under Welfare and Institutions Code section 602.  He contends:  (1) the juvenile court erred by applying an incorrect standard in ruling on his motion to suppress evidence and, in particular, in deciding that his consent to a search of his vehicle was voluntary; (2) the evidence was insufficient to support the court's denial of the motion to suppress, because there was evidence of coercive circumstances at the time P.A. consented to the search; and (3) police actions, including handcuffing P.A., converted his detention into an arrest without probable cause, and the resulting unlawfulness of the arrest vitiated his subsequent consent to the search.  We will affirm the order.

I.  FACTS AND PROCEDURAL HISTORY

An amended wardship petition filed under Welfare and Institutions Code section 602 alleged that P.A. committed felony second degree robbery (Pen. Code,

1

§§ 211, 212.5) while armed with a dangerous or deadly weapon (Pen. Code, § 12022, subd. (b)(1)).

P.A. moved to suppress the evidence obtained from a search of his vehicle. (Welf. & Inst. Code, § 700.1.) On May 2, 2012, the juvenile court held a combined jurisdictional and suppression hearing.

A. *Hearing on Jurisdiction and Motion to Suppress*

    1. *Evidence at the Hearing*

Shortly before 11:00 p.m. on February 17, 2012, victim Taemun An (An) was walking home from a store on Contra Costa Boulevard in Pleasant Hill, carrying two grocery bags and a backpack and listening to music on his iPhone. As he stepped into a crosswalk, "somebody jumped on [him] from the back, so [he] fell on the ground." He testified: "I found two guys in front of me, one guy aiming a gun at me, and both of them were repeating, 'Give me your money, give me your money.'"

One of the assailants was "a little bit chubby." The other, later determined to be appellant P.A., "was a bit skinny and taller than the chubby one" and was wearing "casual clothes like [a] training suit or those hoodies." He believed the assailants were African American or Hispanic. He did not get a good look at the "skinnier" assailant.

An surrendered his wallet. While he lay on the ground, one of his assailants removed his iPhone from his pocket. After repeatedly warning An to "stay here" or "stay on the ground," the assailants ran down the street. An went home and called the police.

Pleasant Hill Police Officer Kristic responded to An's apartment. An described the attack, explaining that there were two suspects, one of whom had a gun similar to the semiautomatic carried by the officer, and that his iPhone was one of the items taken. An's wallet contained about 13 dollars, 50 Philippine pesos, his student ID card, a credit card, a debit card, and a guitar pick.

An subscribed to a service that permitted him to determine the location of his iPhone on his laptop by means of a global positioning system (GPS). An attempted to locate his iPhone before Officer Kristic arrived but was unsuccessful, because the phone

2

was turned off. After the officer arrived, the phone was apparently turned on, and they were able to track the iPhone's location.

The computer screen map indicated that the iPhone was in Concord; two units of officers were sent towards the location. Meanwhile, Officer Kristic continued to monitor the location of the iPhone every 30 seconds and provided updates over the police radio. The iPhone became stationary at the southwest corner of Treat and Cowell, south of a gas station and north of a daycare facility.

Following Officer Kristic's periodic radio reports of the iPhone's location, Officer McGraw responded to the intersection of Treat and Cowell. McGraw had been informed that the phone had been stolen in a robbery by "black or hispanic males" and a firearm was involved. At the southwest corner of the intersection were a gas station and an adjacent parking lot. There were only two vehicles in the parking lot: one was unoccupied; the other was a gray sport utility vehicle (SUV) "occupied by multiple subjects." There were no other people in the area.

Based on the absence of any other person in the vicinity and the GPS signal indicating the presence of the iPhone, Officer McGraw "found it to be reasonably suspicious that this carload of people were likely involved in the robbery."

Officer McGraw parked behind the vehicle and illuminated it with his "Alley light." Because he was the only one at the scene and it was reported that a gun had been used in the robbery, McGraw drew his firearm, ordered the occupants to show their hands outside the SUV's windows, and waited for additional officers to arrive.

Pleasant Hill Police Officer Priebe's canine unit arrived at the scene, followed by officers Vermillion and Holdsworth, along with some Concord police officers.

The SUV occupants were ordered out of the vehicle, one at a time. The vehicle contained five occupants; P.A. was the driver.

Officer McGraw removed the occupants, who were then handcuffed and placed in separate patrol vehicles. During this procedure, the other officers had their weapons drawn to provide cover. In addition, Officer Priebe's canine partner, whose purpose was to "gain compliance [of the occupants] without having to use the dog's teeth or force,"

3

barked as the occupants were taken from the SUV. The occupants were handcuffed due to their number and the possible presence of a firearm.

Officer McGraw asked P.A. if he owned the car, and P.A. replied that he did. The officer asked P.A. permission to search the vehicle, and P.A. responded: "Yes, go ahead." P.A. also made an unsolicited statement that "everything in the car belonged" to him.

Officer McGraw again approached the SUV. By this time, all of the occupants had been removed, and the SUV's doors remained open. From outside the SUV, at the open rear passenger door on the driver's side, Officer McGraw observed the handle of a pistol "sticking out from some other clothing and trash" underneath the driver's seat. Officer McGraw removed the pistol, noticing that it was plastic. Officer McGraw also found the victim's iPhone and wallet on the driver's floorboard and a plastic cap pistol beneath the front passenger seat. The wallet was empty except for a guitar pick.

At Sergeant Vermillion's request, Officer Kristic drove An to the parking lot for a possible in-field identification. Kristic read the infield admonishment to An, which he said he understood. From within 20 feet, An viewed the five handcuffed subjects, illuminated by the lights of the police cars. He "clearly recognize[d]" the heavy-set assailant, but "couldn't really tell . . . which one was the skinny one." According to An, he could not discern if the other four suspects, including P.A., had been involved in the robbery, although they were wearing similar clothes. An testified at trial, however, that P.A. had "similar physical characteristics" as the second assailant. By Officer Kristic's recollection, An was able to identify the heavier suspect by weight, eliminated the next three, and was not sure about the last individual (P.A.).

An identified the iPhone and wallet at the scene as his property. He recognized the gun found beneath the driver's seat – a B.B. gun – as the weapon pointed at him. An recalled that his wallet contained $13 and a 50-peso Philippine bill, and Officer McGraw found that currency in the pants pocket of one of the other SUV passengers.

Hours after the robbery, Officer Vermillion questioned P.A. at the police station. Vermillion read P.A. his *Miranda* rights, and P.A. said that he understood them. P.A.

4

admitted that he had committed the robbery with one of the other passengers in his SUV, that the other three passengers were not involved, and that he was the one who had been holding the gun. Specifically, P.A. admitted to police, he had spotted An walking, followed him, put up the hood on his hoodie, tackled An from behind when they reached a "dark area," told An "[g]ive me everything you've got," grabbed An's wallet from his person, and picked up the iPhone that had fallen from An's possession during the robbery. After the robbery, P.A. tossed some of An's "personal stuff" out of the SUV.

### 2. *Court's Rulings*

As set forth in further detail *post*, the court denied P.A.'s motion to suppress, sustained the robbery allegation, and dismissed the arming allegation.

### B. *Dispositional Order*

At the dispositional hearing on May 16, 2012, the court declared P.A. a ward of the court and ordered the probation department to determine an appropriate placement. In June 2012, P.A. was placed at Valley Teen Ranch in Fresno.

### C. Appeal

On May 8, 2012, P.A. filed a premature notice of appeal. On June 21, 2012, this court construed the notice of appeal to have been taken from the juvenile court's May 16, 2012 dispositional order.

## II. DISCUSSION

P.A. contends: (1) the court erred by applying an incorrect standard in determining that his consent to the vehicle search was voluntary; (2) the evidence was insufficient to support the court's denial of the motion to suppress; and (3) the police actions, including the use of handcuffs, converted the detention into an arrest without probable cause, and the illegal arrest tainted his consent to search.

### A. *The Court's Standard for Determining Voluntariness of Consent*

A search of an individual's vehicle may be conducted without a warrant upon the individual's consent, if the consent is free and voluntary in the totality of the circumstances. (See *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 (*Schneckloth*).) The prosecutor has the burden of showing, by a preponderance of the evidence, that the

5

"defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority." (*People v. James* (1977) 19 Cal.3d 99, 106 & fn. 4 (*James*).)

P.A. contends the juvenile court erred by applying an incorrect standard in ruling on his suppression motion and, in particular, in determining that his consent to the vehicle search was voluntary. Essentially, P.A. argues that the court considered only whether the police actions were reasonable, and not whether they were coercive, in evaluating whether the prosecution met its burden of showing the voluntariness of P.A.'s consent in the totality of the circumstances. P.A.'s argument is unfounded.

### 1. *Background*

Before the hearing, P.A. filed a motion to suppress evidence on the ground that it was obtained by an unreasonable search and seizure. The motion asserted that P.A. was searched and seized without a warrant, and it was the prosecution's burden to establish a sufficient justification. There was no specific discussion of the issue of consent.

After the close of evidence at the hearing, including the evidence that P.A. had consented to the search, defense counsel argued *inter alia* that P.A.'s consent was involuntary. Defense counsel stated: "Given that all these officers were out there – at least five, plus a canine dog that was barking, we heard – we know it was night, we know there were weapons pointed towards them – really, there could not be, under the case law, a really consen[s]ual search. Rather, it was just a mere compliance with police authority." Defense counsel then launched into a much lengthier second argument concerning law enforcement's right to rely on the GPS data, which she contended was hearsay. With analogies to "a Harvey-Madden case" and anonymous tips, defense counsel argued that the officers were not relying on reliable information when they went to the scene, and the officers' de facto arrest was unreasonable.

The prosecutor responded to defense counsel's second argument, contending it was neither a "Harvey-Madden" case nor an anonymous tip situation, since the reporting party was the victim. The prosecutor further noted that "this is not a situation where it

6

was merely to be coercive that [the officers] pulled out their firearms and approached it in this manner," but that they did so because the situation was dangerous.

The court then addressed defense counsel's arguments, starting with the reliability of the victim and the report of there being a gun, and concluding with the voluntariness of P.A.'s consent. The portion of the court's comments on which P.A. relies reads as follows: "That's the most realistic gun. It's frightening – and, obviously – very frightening. [¶] I think at that time they were very appropriate to order the minors out of the car and to ask to search. [¶] They're looking for a loaded gun. As far as they know – I mean, a dangerous gun that was used in an armed robbery – they can't just leave it laying there. [¶] So – and whatever comments the minor's made, I find they were voluntary and deny the motion to suppress."

Based on this language, P.A. insists that the court determined the voluntariness of P.A.'s consent based not on the totality of the circumstances, but solely on the ground that the police action was reasonable.

2. *Analysis*

It is presumed that a court applies the correct legal standard in making its ruling. (Evid. Code, § 664.) P.A. has not overcome this presumption. Nowhere did the court in this case state that it was refusing to consider the totality of the circumstances surrounding P.A.'s consent, let alone the particular circumstances brought to the court's attention at the hearing by defense counsel. At no time did the court state that the voluntariness of P.A.'s consent would be determined by the reasonableness of the police action. Nor did the prosecutor suggest such a standard.

P.A. urges us to draw such an inference from the court's comments quoted above: "That's the most realistic gun. It's frightening – and, obviously – very frightening. [¶] I think at that time they were very appropriate to order the minors out of the car and to ask to search. [¶] They're looking for a loaded gun. As far as they know – I mean, a dangerous gun that was used in an armed robbery – they can't just leave it laying there. [¶] So – *and* whatever comments the minor's made, I find they were voluntary and deny the motion to suppress." (Italics added.) But in our view – given the nature of the

7

arguments presented at the hearing – the court did not conclude that P.A.'s consent was voluntary *because* the police actions were reasonable; it concluded that P.A.'s consent was voluntary *and* the police actions were reasonable. After all, the defense had made two arguments: that the consent was coerced, and that the detention was unreasonable because it was based on an unreliable or uncorroborated tip. This explains why, after addressing the reasonableness of the police actions and saying the word "so," the court apparently stopped itself and used the word "and" before announcing its conclusion as to the other defense argument pertaining to consent. Furthermore, the court said the officers had "ask[ed] to search" rather than demanded to search, perhaps suggesting that the court did not find Officer McGraw's request to be coercive anyway.[1]

At any rate, P.A.'s argument is unavailing for another reason. P.A. urges us to review the court's ruling on the suppression motion de novo, which would mean that any error in the trial court's standard is immaterial as long as the evidence supports the conclusion that P.A.'s consent was voluntary under the proper standard. Similarly, applying a substantial evidence review, the court's purported error of law would be harmless if the evidence was sufficient to establish the requisite consent. We therefore proceed to the sufficiency of the evidence.

B. *Sufficiency of the Evidence of Voluntary Consent*

We review the trial court's determination that P.A.'s consent was voluntary for substantial evidence. As our Supreme Court has admonished: "Our review of the trial court's implied finding that defendant voluntarily consented to the search is limited. 'The . . . voluntariness of the consent is to be determined in the first instance by the trier of

---

[1]    We also point out the following language of our Supreme Court in *James*, which P.A. ignores: "Whether in some other setting the conduct of Officer Ferraro might be deemed coercive is not the issue before us; rather, the precautions he took must be *viewed in the light of his assignment on the evening in question*, i.e., to apprehend a man who was suspected of armed robbery and burglary and was reportedly in possession of a handgun. [Citation.] 'Under these circumstances, to hold as a matter of law that the evidence was produced in response to an unlawful assertion of authority would seriously hamper officers in the reasonable performance of their duties.' [Citation.]" (*James, supra*, 19 Cal.3d at p. 113, italics added.)

fact; and in that stage of the process, "The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings – whether express or implied – must be upheld if supported by substantial evidence." ' [Citation.]" (*People v. Monterroso* (2004) 34 Cal.4th 743, 758 (*Monterroso*); see also *Schneckloth, supra*, 412 U.S. at p. 226 [voluntariness is a question of fact]; *People v. McKelvy* (1972) 23 Cal.App.3d 1027, 1033-1034 (*McKelvy*) [trial court's implied finding that the defendant handed contraband to an officer voluntarily was not supported by substantial evidence].)[2]

In the matter before us, it is undisputed that Officer McGraw asked P.A. for permission to search P.A.'s vehicle, and P.A. unequivocally replied, "Yes, go ahead." P.A. added that everything in the vehicle belonged to him. P.A. nonetheless contends that the evidence, in its totality, showed that his seemingly voluntary consent was in fact coerced.

As P.A. points out, facts that might show a lack of voluntariness include: the consenting person was in custody; the officer had his weapon drawn; the officer failed to administer warnings under *Miranda v. Arizona* (1966) 384 U.S. 436; the officer did not inform the person of his right to refuse to consent; and the person was told that a search warrant could be obtained. (*United States v. Chan-Jimenez* (9th Cir. 1997) 125 F.3d 1324, 1327.) Further, P.A. argues, factors such as the number of police officers present

---

[2]    *McKelvy* states: "Whether in a particular case an apparent consent was voluntarily given or was in submission to an express or implied assertion of authority, is ordinarily a question of fact to be determined from all the circumstances. [Citations.] But where the undisputed facts clearly reveal that an apparent consent was not freely and voluntarily given but was in submission to an assertion of authority, a reviewing court is not bound by a finding of consent by the trial court. [Citations.]" (23 Cal.App.3d at pp. 1033-1034.) The court concluded that no substantial evidence supported the trial court's implied finding that the defendant handed over an object voluntarily. (*Id.* at p. 1034.) *McKelvy* thus stands for the proposition that the trial court's ruling will be upheld if there is substantial evidence to support it, but reversed if the only reasonable conclusion from the evidence is that consent was not freely and voluntarily given – that is, when there is no substantial evidence to support it.

9

and where and when the search takes place can contribute to a finding of coercion. (See *McKelvy, supra*, 23 Cal.App.3d at p. 1034.) Even the presence of a number of these factors, however, does not compel the conclusion that a consent was involuntary. (See, e.g., *Monterroso, supra*, 34 Cal.4th at p. 758; *James, supra*, 19 Cal.3d at p. 118.)

In the context of this case, P.A. expresses his argument this way: "A 'request' [to search] made to an unsophisticated 16-year-old by more than a half-dozen police officers with firearms drawn, in the presence of a barking police dog, while bathed in light in a deserted parking lot late at night while he is handcuffed in a patrol car and separated from his companions hardly invites the expression of free will." His argument is unavailing.

In the first place, P.A.'s argument goes beyond what defense counsel argued at the suppression hearing. Defense counsel did not argue that P.A.'s consent was involuntary because P.A. was bathed in light, in a deserted lot, handcuffed in the patrol car, or separated from his companions. Nor did he argue that coercion was shown by the absence of *Miranda* warnings or an advisement that P.A. could refuse the search. He argued only that the search was not consensual because there were at least five officers plus a barking "canine dog," at night, with weapons pointed towards the suspects, and P.A. was only 16 years old.

Furthermore, in making his argument, P.A. misstates the record in several respects. First, while the age and relative sophistication of a suspect may be a factor in a determination of voluntariness, there was no testimony at the hearing that P.A. was – as he now claims – an "unsophisticated 16-year-old" boy. Although the court knew P.A. was a juvenile, there was no testimony concerning his relative familiarity with law enforcement, criminal procedure, or his constitutional rights. Nor was there evidence that P.A. was particularly susceptible to coercion or displayed any indication that his consent was anything but free and voluntary. While "children generally are less mature . . . than adults" (*J.D.B. v. North Carolina* (2011) 131 S.Ct. 2394, 2397), the evidence in this case did not identify anything in particular that would lead to the conclusion that P.A.'s maturity level was a factor in his consent.

10

Second, there was no evidence that the "request" to search was made "by more than a half-dozen police officers." To the contrary, the request was made by a single officer – Officer McGraw – after P.A. had been placed in a police car. While there were other officers at the general scene, there is no evidence of their specific location when McGraw asked P.A. for his permission to search the SUV. Indeed, P.A. tells us that he was in the patrol car and *separated* from his companions, and there was no testimony that the other officers abandoned those suspects in order to surround P.A. as Officer McGraw asked him whether he could search the vehicle.

Third, there was no evidence that the request to search was made "in the presence of a barking police dog." According to the testimony at the hearing, the canine was there to encourage the subjects to comply with the officers' orders to exit the vehicle, and "also for the purpose of clearing the car, making sure there wasn't somebody hiding in it after we pulled out the people that we can see." The canine was not used to threaten the suspects, but merely "barked and looked at the occupants of the vehicle as we pulled them out of the car and handcuffed them, with other officers." There is no indication that the canine did anything after that point, let alone that it had any possibly coercive influence on P.A. when he was inside the police vehicle and was asked for permission to search the vehicle.

Fourth, there was no evidence that P.A. was "bathed in light." The evidence is that Officer McGraw used his "Alley light" as he pulled up behind the SUV and he had a light on his firearm, which were directed towards the individuals as they got out of the SUV.

Fifth, there was no evidence that Officer McGraw – let alone the "half-dozen police officers" – had their "firearms drawn" *when McGraw asked P.A. if he could search the SUV*. The testimony from Officer McGraw is that he drew his firearm before the other officers arrived, he and the other officers had their firearms drawn while the occupants were still in the SUV, McGraw kept his firearm drawn as each person was ordered out, and the other officers kept their weapons drawn while McGraw placed the individuals in separate patrol cars. But there was absolutely no evidence that McGraw or

11

any other officer had a firearm drawn after the suspects were in handcuffs, and it was apparently only after that point that McGraw asked P.A. permission to search. Certainly there was no testimony that anyone had a gun trained on P.A. when he was asked to give his consent.

P.A. *infers* Officer McGraw's gun was drawn when he sought P.A.'s consent, because McGraw did not specifically testify that he had holstered it after the suspects were secured in separate patrol cars. We question the reasonableness of this inference. But even if it were a reasonable inference, it is not one that we could make: on appeal, we must draw all reasonable inferences in support of the ruling. (*Monterroso, supra,* 34 Cal.4th at p. 758.)

Indeed, much of P.A.'s argument rests on inferences that he draws in a manner most supportive of his position, from evidence of police activity occurring at some place and time other than the place and time of P.A.'s consent to the search. Because our role is not to select from competing inferences from the evidence, but to accept the inferences favorable to the court's order, P.A.'s arguments fail to demonstrate a lack of substantial evidence to support the conclusion that his consent was voluntary.[3]

Moreover, the undisputed circumstances surrounding P.A.'s consent do not preclude a finding of voluntariness. It is true that P.A., when asked to consent to the search, was in "custody" – in the sense that he was detained upon reasonable suspicion by the time he was taken out of his vehicle, handcuffed, and placed in a police car. It also appears to be the case that P.A. had not been advised of his *Miranda* rights or that he had a right to refuse the search. However, none of these facts, alone or in the aggregate, compel the conclusion that P.A.'s unconditional consent was coerced. (*Monterroso, supra*, 34 Cal.4th at p. 758 [substantial evidence supported implied finding that consent to search was voluntary, even though the defendant was arrested and in handcuffs when he gave his consent, he had not received any *Miranda* warnings, and he had not been

---

[3]     Perhaps in some situations, police activity *before* a request for consent, or *away* from the request for consent, could be so extreme that it might render involuntary the consent of a suspect who had witnessed that activity. But that is not the situation here.

12

informed of his right to withhold consent to the search]; *James, supra*, 19 Cal.3d at pp. 106-118 [substantial evidence of voluntary consent where suspect agreed to officer's request to search, even though suspect had been ordered out of his house at night by four officers, was arrested and handcuffed, was standing alone with three armed officers around him when his consent was requested, and had not been advised of his *Miranda* rights or his right to refuse the search]; *United States v. Drayton* (2002) 536 U.S. 194, 206-207 [advising suspect of the right to refuse the search is a factor, but is not required for consent to be voluntary].)[4]

Instructive in this regard is *People v. Ratliff* (1986) 41 Cal.3d 675. There, the defendant contended that he did not validly consent to the search of his car when he was abruptly awakened by uniformed police officers with drawn guns, handcuffed, interrogated without *Miranda* warnings, and told that unless he consented to a car search the officers would simply obtain a warrant and break into the trunk. (*Id*. at p. 686.) However, noting that "the evidence supporting defendant's version of the event was by no means as clear or uncontradicted as defendant would suggest," the court of appeal found there was ample substantial evidence to support the trial court's finding of voluntariness. (*Ibid*.) Assuming that the officers initially drew their weapons, the evidence did not indicate they kept their guns drawn when the actual request for consent was made; neither the failure to give *Miranda* warnings nor the handcuffing of the suspect rendered his consent involuntary; the trial court could reasonably conclude that the handcuffs played no role in the defendant's decision to consent since the request to search occurred minutes after he was handcuffed in another room; and the trial court was

---

[4]    P.A. argues that *Monterroso, supra,* 34 Cal.4th 743 is distinguishable because the defendant was an adult who was not a newcomer to the criminal justice system, and he had time to assess the circumstances and negotiated with police. However, *Monterroso* did not base its ruling on the time the defendant had to assess the circumstances or his negotiation with police; nor did it hold that the consent would have necessarily been involuntary if the defendant had been unfamiliar with the system or if he had not been an adult.

entitled to disbelieve the testimony about the officers' threat in favor of the officer's testimony that the defendant freely consented. (*Id*. at pp. 686-687.)

Here too, assuming that the officers initially drew their weapons, the evidence did not indicate they kept their guns drawn when Officer McGraw asked permission to search P.A.'s car; the absence of *Miranda* warnings and the handcuffing of P.A. does not compel the conclusion of coercion; and there was substantial evidence to support the trial court's conclusion that the consent was voluntary.

In sum, the evidence did not establish coercion as a matter of law, or facts that would necessarily preclude a finding of a valid, voluntary consent to the vehicle search. Given the undisputed evidence that P.A. expressly gave the police permission to search his SUV, and further volunteered that everything in the car belonged to him, there was sufficient evidence from which a reasonable trier of fact could conclude that P.A.'s consent was voluntary.

P.A.'s additional arguments in this regard are unavailing. P.A. emphasizes that, in his estimation, there were at least seven officers and a canine at the scene, citing *People v. Ledesma* (1987) 43 Cal.3d 171, 233-234 (*Ledesma*). But *Ledesma* does not help his cause. The pages he cites from *Ledesma* appeared in the separate concurring opinion of the justice who authored the opinion of the court. (See *id*. at p. 228.) Neither this concurrence nor *Ledesma* generally has anything to do with the facts of this case. The point of the cited portion of the concurrence was that defense counsel had provided ineffective assistance by failing to object to the introduction of a telephone call the police had intercepted from the defendant, after three armed uniformed officers had gained admission to an apartment, searched the apartment for the defendant, and prevented the occupants from answering the phone when it rang, and then one of the officers picked up the receiver, falsely identified herself in Spanish as "Millie," and intercepted the statement. (*Id*. at pp. 234-235.) The concurrence observed that the occupants' purported consent to the officers' entry did not constitute voluntary consent to the interception of the telephone call. (*Id*. at pp. 235-236.) On these facts, the court's opinion noted that the intercepted telephone call was "not beyond challenge," but "wish[ed] to make it clear that

14

we do not decide here the prosecution cannot rebut the presumption of unreasonableness." (*Id*. at p. 227 & fn. 11.) By no means does this suggest that the presence of several officers and a canine unit at the scene of a high-risk felony stop compels the conclusion that P.A.'s express consent to the search of his SUV was involuntary.

Also inapposite is *McKelvy*, *supra*, 23 Cal.App.3d 1027, which P.A. also cites. In *McKelvy*, an officer armed with a shotgun approached a suspect while three other officers carrying a shotgun or carbine moved into position. When the officer asked the suspect to hand over the object he had placed in his pocket, the suspect complied. (*Id*. at p. 1032.) The court ruled there was no substantial evidence to support a finding that the suspect had turned over the object voluntarily, no matter how politely the officer had asked: the suspect's relinquishment was "under compulsion of a direct command by the officer" because it was uncontroverted that the suspect was "standing in a police spotlight, surrounded by four officers all armed with shotguns or carbines." (*Id*. at pp. 1033-1034.) Here, by contrast, it was not uncontroverted that P.A. was in a spotlight surrounded by shotgun-toting officers when asked to consent to the search of his SUV. Although there were several officers at the scene, there is no indication their attention (or light, or guns) was directed exclusively on P.A., who was in a police vehicle, separated from his cohorts, when Officer McGraw asked P.A.'s permission to search.

P.A. further argues that, "[w]hile physically re[s]trained and confronted with this overt show of armed force, no reasonable person would believe that he was free to refuse the requested search." In other words, P.A. implies, police can never use consent to justify a search if they have handcuffed the suspect and gathered in sufficient number and drawn their service weapons to safely detain several suspects who may have just committed an armed robbery with a gun. For this extreme and unfounded proposition, P.A. cites *Bumper v. North Carolina* (1968) 391 U.S. 543 (*Bumper*) and *People v. Challoner* (1982) 136 Cal.App.3d 779, 782 (*Challoner*), neither of which said any such thing.

15

In *Bumper,* four officers seized a rifle in a search of the home of the defendant's grandmother, who had allowed the officers to enter after they represented that they had a warrant to search the house. (*Bumper*, *supra,* 391 U.S. at p. 547.) The Supreme Court held that an officer's claim of authority to search a home under a warrant effectively tells the occupant there is no right to resist the search, thus precluding a valid consent. (*Id*. at pp. 548-549.) In the matter before us, by contrast, there was no evidence that any officer obtained P.A.'s consent by telling him they had a warrant to search his SUV.

In *Challoner, supra,* 136 Cal.App.3d 779, numerous officers with guns drawn arrested the defendant and others in front of a house. One officer, with his gun still drawn, went to the front porch and told the defendant's wife inside that he wanted to enter the house to search for narcotics and other suspects. Another officer was close behind. The wife consented and the officer entered, finding contraband. (*Id*. at p. 781.) The court found there was insufficient evidence that the wife's consent was voluntary: a consent to a search given in response to a request by an armed officer whose gun is drawn is suspect, and although the drawn gun is *not* in itself sufficient to establish coercion, other evidence established that the consent was not " ' "uncontaminated by . . . coercion" ' " due to the number of officers present, the arrest of the woman's husband and others at gunpoint moments before the request to search, the officer's failure to knock before requesting permission to search, the wife's distance from the door, and the officer's display of the weapon when he asked to search. (*Id*. at pp. 782-783.)

*Challoner* is readily distinguishable from the matter before us. Among other things, *Challoner* was premised on the undisputed fact that the officer's gun was drawn at the time that he requested consent to the search. Here, by contrast, whether Officer McGraw's firearm was drawn when he asked P.A. permission to search his SUV is by no means undisputed. In fact, McGraw did not testify that his gun was unholstered when he asked P.A. for his consent.

Lastly, P.A.'s reliance on *People v. Soun* (1995) 34 Cal.App.4th 1499 (*Soun*) is misplaced. In *Soun*, the court expressly *declined to decide* whether there was substantial

16

evidence of a voluntary consent by the suspects to being transported from the scene to the police department.  (*Id*. at p. 1525.)

In the final analysis, P.A. fails to establish error.  Substantial evidence supported a finding that, under the totality of the circumstances, the prosecution had met its burden of affirmatively demonstrating that P.A.'s consent to the vehicle search was voluntary.

C.  *Conversion of Detention to Arrest*

P.A. contends that, even if his consent was not a product of coercion, it must still be invalidated as the tainted fruit of an illegal arrest.  (See *Florida v. Royer* (1983) 460 U.S. 491; *People v. Haven* (1963) 59 Cal.2d 713, 719.)  He is incorrect.

P.A. does not dispute that the police had a sufficient basis for an investigative detention of the occupants of the SUV.  He argues, however, that:  the police actions, including the use of handcuffs, exceeded what was necessary to investigate and thereby converted the detention into a de facto arrest; the arrest was unlawful because there was no probable cause to support it; and the unlawful arrest tainted P.A.'s subsequent consent to the search.  (See *James, supra,* 19 Cal.3d at p. 111 ["Consent secured at gunpoint following an illegal arrest cannot be relied upon to render the evidence obtained by a search and seizure pursuant thereto admissible"].)

Specifically, P.A. argues, he was arrested at the "moment" Officer McGraw ordered him out of the vehicle, pointed a gun at him, handcuffed him, and placed him in the patrol car, because those actions were overly intrusive under the circumstances.  (See *In re Antonio B*. (2008) 166 Cal.App.4th 435, 440.)  He states:  "in response to a report of a second degree armed robbery of a pedestrian, numerous officers from two police agencies converged on a deserted parking lot late at night, bathed appellant's SUV with lights, brandished firearms, shouted orders, and used a barking police dog to challenge the occupants before they pulled them out, handcuffed them behind their backs and placed them in separate police cars."

P.A.'s argument is untenable.  The officers had ample reason to draw their weapons, order the suspects out of the vehicle, employ the canine to bark in order to gain the suspects' compliance without the need for force, and handcuff them.  After all, the

17

officers had received a report of an armed robbery in which the perpetrators brandished a firearm, and the GPS tracking device indicated the stolen phone was at a location where the only observed individuals were in P.A.'s SUV in a dark parking lot around 1:00 a.m. As Officer McGraw testified, the use of the firearm to commit the robbery gave rise to his belief "that there was an unsecured firearm inside the car – which is, obviously, a great threat to myself and other people around."

P.A. argues that those factors are not particularly strong because the GPS signal – the basis for the detention – could have been from the other vehicle in the parking lot. Additionally, he argues, there was no reason to believe that any of the SUV's occupants matched the suspects. His argument is unconvincing. There was no one in the other vehicle, so that vehicle was not going anywhere and posed no apparent threat. The GPS signal provided at least some indication that the SUV might have contained the suspects, and it was reasonable to have the suspects get out of the vehicle in order to determine whether they matched the perpetrators' description.

P.A. emphasizes the officers' use of handcuffs in arguing that the police turned the detention into a de facto arrest. The use of handcuffs does not, however, necessarily convert a detention into an arrest. (*People v. Celis* (2004) 33 Cal.4th 667, 675; *In re Carlos M*. (1990) 220 Cal.App.3d 372, 384-385.) Handcuffs may be used during a detention where, as here, the detainee is suspected of committing a felony (*Celis*, at p. 676) or the officer has a reasonable basis for believing the detainee may flee or pose a physical threat (*People v. Stier* (2008) 168 Cal.App.4th 21, 27-28).

The detention was not turned into an arrest. We therefore need not consider whether there was probable cause to justify an arrest or whether there were intervening circumstance to purge the taint of an unlawful arrest. P.A. fails to establish error.[5]

---

[5]     We also note the testimony that, after the suspects were taken out of the SUV as part of the investigative detention, the SUV doors remained open and Officer McGraw, looking into the SUV from outside the vehicle, spotted what appeared to be a firearm. The parties do not address the significance of this evidence, and we need not address it either.

## III. DISPOSITION

The dispositional order is affirmed.

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BRUINIERS, J.

19