[Crim. No. 4887. Fourth Dist., Div. Two. Mar. 7, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
CHESTER B. McKELVY, Defendant and Appellant.

**COUNSEL**

Charles E. Ward, Public Defender, and Philip S. Barnett, Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Mark L. Christiansen and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TAMURA, J.** — Defendant was charged with possession of a restricted dangerous drug (Health & Saf. Code, § 11910). Following denial of a Penal Code, section 1538.5 motion to suppress, defendant pleaded guilty to the charge as a misdemeanor and was granted probation.[1] His pur-

---

[1] Following denial of his motion to suppress, defendant filed a petition for writ of prohibition or mandamus from this court to review the order denying the motion to suppress. We denied the petition on the ground "the record lodged with this court in support of said petition is incomplete and inadequate" (4th Civ. No. 10971) and defendant's petition for hearing by the Supreme Court was denied. The record thus discloses that denial of defendant's petition for a pretrial writ under Penal Code, section 1538.5, was not on the merits. But even if the record did not affirmatively so indicate, denial without opinion of such pretrial petition for a writ cannot be deemed a conclusive decision on the merits and defendant is entitled to a reviewing court's determination of the validity of the search and seizure on a subsequent appeal from a judgment of conviction. (*People* v. *Medina,* 6 Cal.3d 484, 492-493 [99 Cal. Rptr. 630, 492 P.2d 686].)

ported appeal from the "judgment" will be treated as an appeal from the order granting probation.

The sole issue is the legality of the seizure of the contraband which formed the basis for defendant's conviction.

Officer Lingren of the San Bernardino Police Department was the only witness at the hearing on the motion to suppress. His testimony was in substance as follows:

In the early morning hours of April 11, 1970, Lingren, accompanied by three other officers, was on patrol duty in a marked police unit in the west side area of San Bernardino. As a result of a race riot, a curfew had been imposed which forbade loitering between 11:45 p.m. and 6 a.m.[2]

About 3 a.m. Lingren saw defendant proceeding north along Muscott Street, walking across front lawns of residences. The officer considered this to be "peculiar" because "there [were] sidewalks through the area." The officers put the spotlight on defendant, and as they did so, defendant glanced back and was seen to place "a small dark-colored object" he was holding in his hand into his front pants pocket. The officers stopped the patrol car and Lingren, armed with a shotgun, approached defendant. At the same time the other three officers, each carrying either a shotgun or carbine, moved "into position" to cover the police unit and each other. Lingren testified this was normal police procedure because of the possibility of "Molotov cocktails."

Lingren's initial purpose in stopping defendant was to find out why he was out on the street. When the officer asked defendant where he was going, defendant replied he was going to his home on Ramona Street. Lingren testified the answer was suspicious because "going home" was the common answer he received from "95% of the people we stopped and talked to." Without further inquiry Lingren asked defendant to hand over the object he had placed in his pocket. Defendant complied and handed the officer a small brown bottle containing white and pink tablets. Defendant was thereupon placed under arrest. Lingren testified he arrested defendant for a curfew violation.

The People urge that the order denying the motion to suppress may be upheld on several theories: (1) Voluntary consent to seizure; (2) search incident to lawful arrest for a curfew violation, (3) search incident to a

---

[2]The ordinance provided in pertinent part: "1. No person shall loiter in or about any public street or other place . . . between the hours of 11:45 p.m. on August 10, 1970 and 6:00 a.m. on August 11, 1970."

valid detention for investigation. It is our conclusion that seizure of the contraband cannot be justified on any of the proffered theories.

## I

The order denying the motion to suppress cannot be sustained on the basis of an implied finding of voluntary consent.

■ Once it is established that a search or seizure was made without a warrant, the burden is on the prosecution to show proper justification. (*People* v. *Marshall*, 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442 P.2d 665].) ■ Where the government relies upon consent, it has the burden of presenting "substantial evidence of consent to the search." (*Castaneda* v. *Superior Court*, 59 Cal.2d 439, 444 [30 Cal.Rptr. 1, 380 P.2d 641].) The burden has been characterized as a "heavy" one. (*Parrish* v. *Civil Service Commission*, 66 Cal.2d 260, 270 [57 Cal.Rptr. 623, 425 P.2d 223].) The government must show "that the consent was, in fact, freely and voluntarily given" and the "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (*Bumper* v. *North Carolina*, 391 U.S. 543, 548-549 [20 L.Ed.2d 797, 802, 88 S.Ct. 1788, 1792].) The People must show that consent was "uncontaminated by any duress or coercion, actual or implied." (*Channel* v. *United States* (9th Cir. 1960) 285 F.2d 217, 219; *Judd* v. *United States*, 190 F.2d 649, 651 [89 App.D.C. 64]; see *People* v. *Cruz*, 264 Cal.App.2d 437, 442 [70 Cal. Rptr. 249].)

■ " 'To protect his right to object to an unreasonable search or seizure a defendant need not forcibly resist an officer's assertion of authority to . . . search . . . his person [citations], but if he freely consents to . . . [a] search, or voluntarily produces evidence against himself, his constitutional rights are not violated and any search or taking of evidence pursuant to his consent is not unreasonable. [Citations.]' " (*Lane* v. *Superior Court*, 271 Cal.App.2d 821, 825 [76 Cal.Rptr. 895]; *Castaneda* v. *Superior Court*, *supra*, 59 Cal.2d 439, 442; *People* v. *Shelton*, 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665]; *People* v. *Michael*, 45 Cal.2d 751, 753 [290 P.2d 852].) ■ Whether in a particular case an apparent consent was voluntarily given or was in submission to an express or implied assertion of authority, is ordinarily a question of fact to be determined from all the circumstances. (*Castaneda* v. *Superior Court*, *supra*, 59 Cal.2d 439, 442; *People* v. *Shelton*, *supra*, 60 Cal.2d 740, 746.) But where the undisputed facts clearly reveal that an apparent consent was not freely and voluntarily given but was in submission to an assertion of authority, a reviewing court is not bound by a finding of consent by the

trial court. (*Lane* v. *Superior Court, supra,* 271 Cal.App.2d 821, 825-826; see *Parrish* v. *Civil Service Commission, supra,* 66 Cal.2d 260, 270.)

■ Applying the foregoing principles to the present case, the uncontroverted facts were that defendant was standing in a police spotlight, surrounded by four officers all armed with shotguns or carbines. In these circumstances no matter how politely the officer may have phrased his request for the object, it is apparent that defendant's compliance was in fact under compulsion of a direct command by the officer. (See *People* v. *Hubbard,* 9 Cal.App.3d 827, 831 [88 Cal.Rptr. 411]; *Stern* v. *Superior Court,* 18 Cal.App.3d 26, 30 [95 Cal.Rptr. 541] (consent at gunpoint following arrest cannot validate search).) The evidence established "no more than acquiescence to a claim of lawful authority." Any implied finding that defendant handed over the object voluntarily is not supported by substantial evidence.

## II

■ Nor can the seizure be justified as a search incident to a lawful arrest for a curfew violation.

Because of tensions engendered by race riots, the Mayor of the City of San Bernardino, pursuant to a civil disaster ordinance, promulgated curfew regulations which included a prohibition against loitering "in or about any public street or other public place" between prescribed hours.[3] Officer Lingren testified he arrested defendant for a curfew violation because he was "evasive more or less in his answers" and that "he had actually no purpose in the area." While the riot situation and the lateness of the hour may have been reasonable justification for stopping and temporarily

---

[3]The amended curfew regulations promulgated by the mayor were as follows:

"Under the state of civil disaster now existing in San Bernardino, California, and pursuant to the authority vested in me by Ordinance No. 1931 to make and issue rules and regulations on matters reasonably related to the protection of life and property as affected by such disaster, I hereby make and issue the following rules and regulations subject to confirmation by the Common Council at its next meeting:

"1. No person shall loiter in or about any public street or other public place in the City of San Bernardino between the hours of 11:45 p.m. of August 10, 1970, and 6:00 a.m. of August 11, 1970 and between the hours of 6:00 p.m. of August 12, 1970 and 6:00 a.m. of the following day.

"2. No person shall conduct or participate in a meeting, assembly or parade, or use a voice or sound amplifier, in or upon the public streets or highways or other public place in the City of San Bernardino at any time during the presently proclaimed state of civil disaster.

"3. Any violation of these rules and regulations shall be punished as provided by Ordinance No. 1931."

The record reveals that the only difference between the amended curfew regulations, quoted above, and the original ordinance is the period of time involved which is not pertinent to our case.

detaining defendant for the purpose of requesting his identity and his reason for being on the street, the evidence does not support a finding of probable cause to arrest for loitering in violation of the curfew regulations.

■ The validity of the curfew regulation imposed in the instant case has not been questioned nor need we reach that issue in order to resolve the issues posed by the present appeal. But it is proper to note that because such regulations drastically curb an individual's freedom, only a clear showing of emergent necessity can justify its imposition. (See *Judicial Control of the Riot Curfew,* 77 Yale L.J. 1560.) Freedom of movement is a fundamental right and its exercise may be restricted only where necessary to further the most compelling state interest. (*Carroll* v. *United States,* 267 U.S. 132, 153-154 [69 L.Ed. 543, 551-552, 45 S.Ct. 280]; *People* v. *Superior Court (Kiefer)* 3 Cal.3d 807, 815 [91 Cal. Rptr. 729, 478 P.2d 449]; *People* v. *Horton,* 14 Cal.App.3d 930, 933-934 [92 Cal.Rptr. 666]; *Wirin* v. *Horrall,* 85 Cal.App.2d 497, 501 [193 P.2d 470].) And the regulations must be narrowly circumscribed in order to withstand a constitutional challenge for overbreadth and vagueness. (*In re Hoffman,* 67 Cal.2d 845, 852-853 [64 Cal.Rptr. 97, 934 P.2d 353]; *Ames* v. *City of Hermosa Beach,* 16 Cal.App.3d 146, 151-152 [93 Cal. Rptr. 786]; *People* v. *Horton, supra; Mandel* v. *Municipal Court,* 276 Cal.App.2d 649, 657-663 [81 Cal.Rptr. 173].)

■ Mere presence on the street during the prohibited hours cannot constitute "loitering" within the meaning of penal statutes or police regulations. (*Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156, 163 [31 L.Ed.2d 110, 116, 92 S.Ct. 839].) As a proscribed criminal conduct, the word "loiter" has been held to connote "lingering in the designated places for the purpose of committing a crime as opportunity may be discovered." (*In re Cregler,* 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305]; *People* v. *Caylor,* 6 Cal.App.3d 51, 56 [85 Cal.Rptr. 497]; see also *In re Hoffman, supra,* 67 Cal.2d 845, 853.) In sustaining an ordinance making it unlawful for a person to roam or be upon a public street during certain hours "without having and disclosing a lawful purpose," the Oregon Supreme Court held that a person "must be deemed innocent unless his voluntary conduct overcomes the apparent and presumed innocence of his movements by disclosing a purpose to violate some law other than the ordinance in question." (*City of Portland* v. *Goodwin,* 187 Ore. 409, 431 [210 P.2d 577, 586] (opn. denying rehg.).)

In defining the elements necessary to sustain a conviction for loitering under subdivision (e) of Penal Code, section 647,[4] it has been held that the prosecution must establish: "(1) that the accused was loitering or wandering without apparent reason or business; (2) that, although requested by an officer, he refused to identify himself and account for his presence, and (3) that public safety considerations reasonably indicated a necessity for the defendant's identification." (*People* v. *Caylor, supra,* 6 Cal.App.3d 51, 56; *People* v. *Bruno,* 211 Cal.App.2d Supp. 855, 859 [27 Cal.Rptr. 458].)

Penal Code, section 647, subdivision (e), was designed and drafted in an attempt to avoid the challenge of vagueness and to provide a reasonable formula for the accommodation of the legitimate interest of the state in crime prevention and the right of a citizen to be free from arbitrary or dictatorial police intrusion into his affairs.[5] (22 Assem. Interim Com. Report No. 1, pp. 14-18; see *People* v. *Weger,* 251 Cal.App.2d 584, 590-591 [59 Cal.Rptr. 661]; *People* v. *Bruno, supra,* 211 Cal.App.2d Supp. 855, 859-860.) While the curfew regulations promulgated by the mayor in the instant case did not define the proscribed conduct of loitering with the specificity of Penal Code, section 647, subdivision (e), the regulation must, in order to avoid the challenge for vagueness, be interpreted as requiring proof of the essential elements required for conviction of loitering under the Penal Code section.

Admittedly, the issue is not whether the facts known to the officer would have been sufficient to support a conviction for loitering; the question is whether the officer had reasonable cause to believe that the offense was being committed in his presence. (Pen. Code, § 836.5, subd. (a).) But "the test for determining whether reasonable cause exists for an arrest is objective and not dependent upon the arresting officer's subjective

---

[4]As pertinent, Penal Code, section 647, provides:
"Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor:
". . . . . . . . . . . . . .
"(e) Who loiters or wanders upon the streets or from place to place without apparent reason or business and who refuses to identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification."

[5]The constitutionality of subdivision (e) of Penal Code, section 647, was upheld in *People* v. *Weger,* 251 Cal.App.2d 584 [59 Cal.Rptr. 661]. Whether that decision can be reconciled with the recent decision of the United States Supreme Court in *Papachristou* v. *City of Jacksonville, supra,* 405 U.S. 156, striking down a Jacksonville vagrancy ordinance is a question we need not and do not reach in the instant case.

good faith . . . ." (*People* v. *Superior Court,* 15 Cal.App.3d 146, 152 [92 Cal.Rptr. 916].)

Turning to the facts of the instant case, assuming that the officer reasonably believed that considerations of public safety indicated a necessity for temporary detention for investigation, there is nothing in the record to indicate defendant either refused to identify himself or to account for his presence. The record is devoid of any inquiry by the officer other than his initial question as to what defendant was doing in the area. Defendant stated that he was "going home," and that his home was on Ramona Street. The officer conceded that defendant was walking in the proper direction to reach Ramona Street. Defendant's response can hardly be characterized as "evasive" or "suspicious." The officer testified the answer was suspicious because "going home" was the "common answer that we received from 95% of the people we stopped and talked to." But there was no attempt on the part of the prosecution to show that like responses by the 95 percent of the people the officer had talked to turned out to be false. Moreover, even if it was the usual response and was usually false, defendant ought not to suffer the consequences of others' false responses. To deprive one of his freedom on such flimsy evidence smacks of totalitarianism; it hardly comports with our commitment to the concept of individual justice. If the officer felt the answer was suspect, he should have questioned defendant further to ascertain the truthfulness of the response. This he neglected to do. Without further inquiry, he ordered defendant to "hand me what you had in your hand."

In a further attempt to "articulate" his reasons for believing defendant was "loitering" in violation of the curfew ordinance, the officer alluded to the fact that defendant was walking on the lawns of the residences rather than on the "sidewalks through the area." However, the record fails to show just how close to the residences defendant was walking, or even whether there was a sidewalk on that side of the street. While the fact that defendant was walking across lawns, coupled with the lateness of the hour, may have justified an investigation, those facts alone did not provide probable cause to arrest for "loitering." One of the essential elements of the offense is unexplained presence in the area. Evidence of that element was entirely lacking in the instant case.

In *People* v. *Caylor, supra,* 6 Cal.App.3d 51, defendant suddenly appeared "out of nowhere," in a dark residential area at 11:30 p.m. where there had been numerous complaints of prowlers and burglaries. The officers stopped defendant and asked him for his identity and his reason for being in the neighborhood. After the officers asked him six, or more, times for his name and some identification, defendant finally said, after looking

surreptiously through a billfold, that he had none on him and the officers would have to take him to his "pad" if they wanted to find out about him. He refused to give his address or provide a rational explanation for his presence in the area even though he was given ample opportunity to do so. Other cases in which probable cause to arrest for loitering was found to exist reveal similar evidence of persons being in a suspect area at a late hour coupled with flight, furtive action, or evasive responses to requests for identification and explanation for being in the area. (*People* v. *Superior Court, supra,* 15 Cal.App.3d 146, 154.)

The record in the present case discloses no lingering, aimless wandering, peering at houses, furtive or evasive conduct, lack of cooperation, or refusal to answer questions concerning identity or reasons for presence in the area.

 "The decision as to whether the facts and circumstances known to the officer at the time he made the arrest were sufficient to lead a man of ordinary care and prudence to believe and conscientiously to entertain a strong suspicion that the law was being violated or had been violated must be made independently by the judicial branch of the government regardless of the characterization or label attributed to the defendant's conduct by the arresting officer." (*People* v. *Superior Court, supra,* 15 Cal.App.3d 146, 152; *People* v. *Boyles,* 45 Cal.2d 652, 656 [290 P.2d 535].) The uncontroverted facts in the instant case fail, as a matter of law, to show the existence of probable cause to arrest defendant for loitering in violation of the curfew ordinance. The search cannot be justified as an incident to a valid arrest.

### III

 As an alternative ground for justifying the seizure of the contraband, the People rely upon the right of an officer to conduct a limited search for weapons when he has reason to believe that the person detained for investigation under circumstances short of possible cause to arrest is armed or dangerous.

 The scope of such a search, however, has been narrowly drawn. (*Irwin* v. *Superior Court,* 1 Cal.3d 423, 428 [82 Cal.Rptr. 484, 462 P.2d 12].) Although the officer need not be absolutely certain that the individual is armed, a reasonably prudent man in the circumstances must have been warranted in believing that his safety or that of others was in danger. (*Sibron* v. *New York,* 392 U.S. 40, 65 [20 L.Ed.2d 917, 936, 88 S.Ct. 1889].) And the search so authorized is limited to a patdown of the outer clothing of the suspect for concealed objects which might be used as an instrument of assault. "Unless the officer feels an object which a prudent

man could believe was an object usable as an instrument of assault, the officer may not remove the object from the inside of the suspect's clothing, require the suspect to take the object out of his pocket, or demand that the suspect empty his pockets. If the officer obtains contraband from the suspect's clothing, the trial court, in order to justify the search and the introduction of the fruits of the search into evidence, must find that the object could have felt like an object usable as an instrument of assault. (See *Sibron* v. *New York, supra*, 392 U.S. 40, 64-66 [20 L.Ed.2d 917, 935-936]; *People* v. *Britton, supra,* 264 Cal.App.2d 711, 717 [70 Cal.Rptr. 586].) A box of matches, a plastic pouch, a pack of cigarettes, a wrapped sandwich, a container of pills, a wallet, coins, folded papers, and many other small items usually carried in an individual's pockets do not ordinarily feel like weapons. A more intensive or broad search 'violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable instrusions [*sic*] on the part of all government agents.' (*Sibron* v. *New York, supra*, 392 U.S. 40, 65-66 [20 L.Ed.2d 917, 936].)" (*People* v. *Mosher,* 1 Cal.3d 379, 394 [82 Cal.Rptr. 379, 461 P.2d 659].)

▮▮▮ In the instant case, there was a paucity of evidence from which a prudent man could reasonably have believed that defendant was armed or dangerous. Officer Lingren consistently described the item defendant was seen to place in his pocket as being "small"; he did not testify he believed the object to be a weapon but merely that it "could have possibly been a rock" or that the object "might have been a weapon; possibly been a weapon." But even assuming that out of an abundance of caution the officers were justified in taking precautions against the possibility that defendant was armed, all that was authorized was a patdown search. If they then felt an object which a prudent person could believe was an object usable as an instrument of assault, they could have removed it or requested defendant to do so. In the present case, the officers did not conduct a patdown; they simply demanded that defendant hand over the object he had placed in his pocket. In so doing they exceeded the permissible scope of a search for weapons incident to a detention for investigation.

It is suggested that under the circumstances the officers were excused from conducting the traditional limited patdown because to approach defendant under the explosive "riot" situation might have endangered the lives of the the officers. However, there was no evidence of rioting or violence that night, either in the area where defendant was arrested or elsewhere in the city. Moreover, the officers were not confronted with a menacing crowd. All we have is a lone man standing in a police spotlight surrounded by four officers armed with shotguns and carbines. There was no factual justification for excusing a patdown. If a patdown had been con-

ducted, it is not likely that the small "container of pills" would have felt like a weapon. (See *People* v. *Mosher, supra,* 1 Cal.3d 379, 394.)

The circumstances of *People* v. *Fry,* 271 Cal.App.2d 350 [76 Cal.Rptr. 718], are distinguishable. In that case the officer saw an oblong bulge in the suspect's left front pants pocket which looked like a large knife. When the officer asked what he had in his pocket, the suspect replied it was a "knife" and *voluntarily* removed a 4-inch folding blade knife. The reviewing court held that the evidence supported the alternative conclusions that defendant either voluntarily produced the object or did so in response to the officer's request but that in either case the action of the officer was proper. The court reasoned that even a cursory patdown would have revealed that the object was a knife.

We conclude that the seizure of the evidence which formed the basis for defendant's conviction was invalid. While the state of emergency stemming from the race riots may have justified the imposition of the curfew ordinance and called for extra vigilance on the part of the officers, it did not abrogate a citizen's Fourth Amendment right to be free from unreasonable police intrusion. Excessive police zeal under such circumstances can only tend to exacerbate rather than ease racial tensions.

The order granting probation is reversed.

Gabbert, J., concurred.

**GARDNER, P. J.—I dissent.**

I agree that there was no voluntary consent and I will not quibble with the majority on the issue of loitering since it is quite clear that the officers had the right to detain the defendant for investigation, and that their actions in demanding that the defendant disclose to them the object they had seen him put in his pocket were reasonable and in no way a violation of his constitutional rights.

I *am* troubled by the ambivalent attitude of the majority toward the right of the officer to detain the defendant for questioning, ("assuming that the officer reasonably believed that considerations of public safety indicated a necessity for temporary detention for investigation"). I gather from this that the majority have some reservation about the officers' right to even detain a man found at 3 o'clock in the morning, walking across someone's front yard. At the risk of displaying an attitude which may "smack of totalitarianism," I sincerely hope that if police officers find someone walking

across my front yard at 3 o'clock in the morning, they will at least stop him to inquire just what in the world he is doing at that particular time and place. While it may sound like broken record litany, I should point out that the law is quite clear that circumstances short of probable cause to make an arrest may still justify officers stopping individuals at night for questioning when the circumstances are such as would indicate to a reasonable police officer that such a course of action is necessary to the proper discharge of his duties. (*People* v. *Superior Court* (*Kiefer*) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449]; *People* v. *One 1960 Cadillac Coupe*, 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706]; *People* v. *Michelson,* 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Manis*, 268 Cal. App.2d 653 [74 Cal.Rptr. 423].) If the circumstances of this case are not sufficient for a temporary detention for questioning, then police officers may just as well cease patrolling residential neighborhoods and remain in the comparative safety of the station house—a procedure any officer reasonably concerned about his life and safety would probably welcome in view of the holding of the majority.

However, the portion of the majority opinion which really disturbs me is the holding that the officers could not order the defendant to remove from his pocket the object that they had seen him place therein. In these troubled times, I strongly feel that police officers are deserving of more support from the courts than that reflected by the holding of the majority.

What actually was the situation facing these officers?

(1) They were patrolling an area which had been officially declared a state of disaster because of riots due to racial disturbances. I gather that the officers were taking the sitaution seriously. A patrol car containing four officers armed with shotguns and rifles is not used to police Brownie picnics. A riot situation is an ugly one. Tensions are high and moods are explosive. During a riot, people who are ordinarily normal or even placid are apt to react in unpredictable ways. I do not suggest that a riot situation (short of martial law) changes the rights of the individual involved therein under the First Amendment, I merely suggest that the riot background is an important factor to take into consideration in determining the reasonableness of the officers' conduct. The majority is apparently disturbed because at the moment of this incident there was not an actual rock throwing, Molotov cocktail tossing riot complete with snipers and fatalities taking place. I prefer to give the officers a little more leeway. They were faced with a situation where, as a result of a race riot, the area had been declared a state of disaster. A curfew had been imposed. By radio and newspaper, citizens had been warned to stay off the streets between 6 p.m. and 6 a.m. Upon stopping the defendant, four heavily armed officers moved

into position to cover the police unit and each other. I think that a reasonable reading of even this sparse record would reflect the existence of a tense situation.

(2) At 3 o'clock in the morning the officers observed the defendant walking across a residential lawn when sidewalks were available.

(3) With that as a background, the officers put a spotlight on the defendant. He turned back, looked at the officers, then placed an object he was holding in his hand in his front pants pocket. The object was small and dark and the officers thought it might be a weapon. They obviously took the situation more seriously than the majority of this court because two of them went to the other side of the street about 20 yards from the defendant, another stayed about 10 yards away, and the remaining officer approached the defendant standing back about 4 feet. All were armed with shotguns or rifles. According to the testimony, this was "normal procedure due to problems arising from Molotov cocktails." Officer Lingren asked the defendant where he was going and the defendant said he was going home. Officer Lingren then said, "Would you hand me what you have in your hand?" The defendant did so and it turned out to be a bottle of pills.

I think it is a matter of some note that the officer had no hint that the defendant was carrying drugs. This was no "roust," no subterfuge search, no going through pockets, no shaking down the defendant under the pretext of looking for weapons. The officers were not using this incident as an excuse to perform an exploratory search of the defendant, nor did they cause him to empty his pockets of everything they contained. All Officer Lingren did was ask the defendant to show him what was in the hand he had just thrust into his pocket upon seeing them. The officer reasonably believed it to be a weapon. In this connection, the United States Supreme Court has stated: "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry* v. *Ohio*, 392 U.S. 1, 27 [20 L.Ed.2d 889, 909, 88 S.Ct. 1868].) Here, Officer Lingren was not absolutely sure that defendant was armed, but, as a reasonably prudent man, under these particular circumstances he was entitled to a reasonable belief that his safety and that of his fellow officers was in danger. "The plainest dictates of prudence required that the officers proceed with utmost caution." (*People* v. *Spencer*, 22 Cal.App.3d 786, 797 [99 Cal.Rptr. 681].) "When an officer has reasonable cause to believe a person subject to investigation is in possession of a weapon he has a right to direct the person to deliver the weapon to him." (*People* v. *Fry*, 271 Cal.App.2d 350, 354 [76 Cal.Rptr. 718].)

The majority in a rigid and ritualistic application of the "patdown"

procedure insist that the officer approach the defendant whom they had just seen thrust into his front pants pocket that which they reasonably believed was a weapon and which he still had in his hand ("Would you hand me *what you have in your hand*?") and pat him down. I think that a recent comment by Mr. Justice Thompson in his concurring opinion in *People* v. *Rhodes, ante,* pp. 257, 265 [100 Cal.Rptr. 487] is apropos: "No police officer possessed of his faculties will be convinced by a rhetoric of judges, whose exposure to danger has been strictly vicarious, that he should not search beyond a patdown if he feels the person detained by him may conceivably have a weapon in his possession."

I am aware of the sentence in *People* v. *Mosher,* 1 Cal.3d 379, at page 394 [82 Cal.Rptr. 379, 461 P.2d 659], quoted by the majority, which reads: "Unless the officer feels an object which a prudent man could believe was an object usable as an instrument of assault, the officer may not remove the object from the inside of the suspect's clothing, require the subject to take the object out of his pocket, or demand that the suspect empty his pockets." This statement must be evaluated within the context of the factual situation presented in *Mosher* and must be balanced against the factual situation in the instant case. *Mosher* simply arose from the arrest of a defendant by two officers as a result of which a normal patdown ensued. The portion of the above sentence having to do with an officer requiring a suspect to take an object from his pocket was dictum. (See *People* v. *Superior Court,* 20 Cal.App.3d 1085 [98 Cal.Rptr. 161]; *People* v. *Gregg,* 5 Cal.App.3d 502 [85 Cal.Rptr. 273].) It does not apply to a situation such as the instant case in which the officer confronted with a race riot, public tension and an explosive situation sees an individual place in his pocket that which he reasonably believes to be a weapon. Under these circumstances, it is quite reasonable for an officer to stand away from a defendant and ask him to hand over that which the officer has reasonable cause to believe is a weapon.

Under the circumstances of this case, the law does not demand that officers approach an individual close enough for the traditional patdown. Had Officer Lingren done so under the instant circumstances, and had the object been a gun, razor, knife, or even a rock, his safety or even his life might have been endangered. Under circumstances such as these, it was eminently reasonable, practical and legal for the officer to stand off at a safe distance and demand the supposed weapon rather than subject himself to additional danger by approaching close enough for a patdown. A reasonable officer is a practical officer, a practical officer is a live officer. The actions of Officer Lingren in this case were completely reasonable and in no way infringed on the defendant's constitutional rights.

The majority terminates its opinion with the following statement with which I am, of course, in complete accord: "While the state of emergency stemming from the race riots may have justified the imposition of the curfew ordinance and called for extra vigilance on the part of the officers, it did not abrogate a citizen's Fourth Amendment right to be free from unreasonable police intrusion. Excessive police zeal under such circumstances can only tend to exacerbate rather than ease racial tensions."

I will terminate this dissent with the following observation. We on the courts are faced with an eternal dilemma, the everlasting knife edge on which we are asked to balance the freedom of the individual versus the need for social discipline as reflected by appropriate law enforcement in order that we may all enjoy the ordered amenities of life. In order that we may all have this protection of the law, those charged with enforcing the law must have the right to protect their own lives and safety in enforcing the law. According to the news media, 12 police officers were killed in the line of duty during the month of January of this year. Surviving police officers are going to receive little comfort from a holding that they must engage in patdown searches under conditions such as those disclosed in the instant case or risk the charge of violating the constitutional rights of the individual involved.

I would affirm the order granting probation.

A petition for a rehearing was denied March 24, 1972, and respondent's petition for a hearing by the Supreme Court was denied May 4, 1972. McComb, J., and Burke, J., were of the opinion that the petition should be granted.