Filed 7/29/14  P. v. Soto CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JOSE SOTO et al., <br><br> Defendants and Appellants. | F065248 <br><br> (Super. Ct. Nos. BF137486A & BF137486B) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant Jose Soto.

Tutti Hacking, under appointment by the Court of Appeal, for Defendant and Appellant Ruben Davila Perez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Alice Su, and Tia Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendants Jose Soto and Ruben Davila Perez entered into negotiated dispositions after the denial of their motion to suppress the evidence. Soto pled no contest to possession of a controlled substance (Health & Saf. Code,[1] § 11377, subd. (a)), and Perez pled no contest to possession of narcotics for sale (§ 11378) and admitted a prior conviction pursuant to section 11370.2, subdivision (c). As a result of their pleas, the trial court sentenced Soto to a 16-month term and Perez to a term of four years four months. Both defendants were ordered to serve their terms in the Kern County jail pursuant to Penal Code section 1170, subdivision (h).

On appeal, defendants[2] contend the trial court erred in denying their motion to suppress pursuant to Penal Code section 1538.5. We disagree.

## FACTS

As the sole issue presented on appeal is related to the motion to suppress, we will confine our factual summary to the facts adduced at that hearing.

### Hearing on the Motion to Suppress

Bakersfield Police Officer Dean Barthelmes was dispatched to the 2400 block of Valentine Street regarding a report of loud music at approximately 10:48 p.m. He was accompanied by Officer King. The two were in a marked patrol vehicle, wearing police uniforms, and armed with firearms. Upon arriving in the area, the officers rolled down their windows, lowered the volume on the radio, and drove slowly through the area, listening for any loud music. The officers drove substantially slower than the 25-mile-per-hour speed limit. While driving in the area, Barthelmes observed Soto and Perez seated in a parked vehicle at the end of Valentine at its intersection with Hughes Lane. Soto was in the driver's seat while Perez was in the passenger seat.

Upon noticing the vehicle, Barthelmes activated his spotlight and illuminated the vehicle's interior. He was between 50 and 100 feet away. He did so to determine

---

[1]All further references are to the Health and Safety Code unless otherwise indicated.

[2]Perez filed a motion to join Soto's arguments on appeal. That motion is granted.

2.

whether the vehicle was occupied as it was parked in an area not near any residences. Driving westbound on Valentine, Barthelmes made a quick northbound turn and an immediate U-turn, positioning the patrol car behind defendants' vehicle. Although the officer described the turn as "quick," he clarified it was "slow, but it was quick. I mean, my tires didn't screech or anything like that." The officer did not have the spotlight focused on the vehicle during the turn. Barthelmes resumed illuminating the interior of the vehicle with his spotlight after he stopped the patrol vehicle approximately 10 to 15 feet behind defendants' vehicle. There were no other vehicles or obstructions in front of defendants' vehicle. The officers never activated their siren or emergency lights.

Barthelmes intended to contact the occupants of the vehicle to determine if they were the source of the music and, if so, to tell them to turn it down. However, the officers had not heard any loud music coming from the car.

Before exiting the car, the officers provided dispatch with their location and the license plate number of defendants' vehicle. The spotlight remained on and illuminated the interior of the vehicle throughout the remainder of the contact. Subsequently, Barthelmes approached the vehicle on the driver's side while King approached on the passenger side. Using a flashlight, Barthelmes illuminated the interior as he approached to ensure no one was holding a weapon.

Barthelmes asked defendants what they were doing and informed them he had received a report of loud music in the area. Soto responded he was waiting for his girlfriend, who lived nearby. He stated they had been there for 5 to 10 minutes and had not been playing their music very loudly. Barthelmes continued speaking with Soto and asked if he had any identification. Soto replied he did not, but did provide his true name and date of birth when asked. Meanwhile King asked similar questions of Perez.

During the conversation, Barthelmes asked defendants if they were on probation or parole. Perez indicated he was not on either probation or parole. After receiving this information, King stepped away from the vehicle and conducted a records check. Officer Barthelmes remained next to the vehicle. Barthelmes did not recall Perez providing his

3.

identification card for the records check. The check confirmed Soto had no warrants and had a valid driver's license, but also revealed Perez was on parole. The entire contact up to that point lasted between three and seven minutes.

The officers never brandished their weapons during their contact with defendants. They did not use any restraints, tell defendants they were not free to leave, or order defendants from the car prior to learning Perez was on parole. The officers also never told defendants they were free to leave during the contact. They never observed any law violations or loud music coming from the vehicle. Nothing indicated defendants were engaged in illegal activity when the officers encountered them. The parties stipulated Perez was on parole at the time of the search.

Upon learning of Perez's parole status, Barthelmes asked him why he had lied about being on parole. Perez responded he did not think he was on parole because he did not have to report to a parole officer or drug test.

After learning of Perez's parole status, the officers conducted a parole search of Perez and of the portion of the vehicle accessible to Perez. The search revealed several packages of methamphetamine in the vehicle. At that point both defendants were arrested.

Soto presented evidence through a private investigator that the person who reported the loud music stated the noise was coming from the direction opposite of where defendants were located. However, there was no evidence the officers were ever provided with this information. Defendants also introduced the recording of the initial call to the police.

### Arguments of counsel

Soto argued there were no facts to support a detention in the case, and the officers in fact detained defendants once they approached the car, with a spotlight and flashlights, and began asking the occupants questions and requested their identification. Perez joined in Soto's arguments and added that, as a passenger, a different standard should apply to Perez.

The People conceded there were no facts present to justify a detention in this case, arguing, however, there was no detention; rather, the situation amounted to a consensual encounter. To the extent the court found a detention, the prosecution argued the search was sufficiently attenuated from the detention thereby making the suppression of the evidence unnecessary.

### *The trial court's ruling*

After the hearing, the trial court took the matter under submission and later issued a written ruling. The trial court noted there was conflicting evidence regarding the nature of the initial call, although the conflict was insignificant. The court noted the actual dispatch provided to the officers was never produced in evidence. After considering all of the circumstances, the court found no detention occurred. The court explained the police are "entitled to consensual contact with citizens, in parked cars or not." Although the officers spotlighted the vehicle (for officer safety), they never activated their emergency lights or siren, nor blocked the car in any way. The officers parked 10 to 15 feet behind defendants and made no commands to defendants during the encounter. Moreover, there was

> "nothing in the evidence to suggest the officers approached in an intimidating fashion or that the contact thereafter was not cordial. The defendants were advised of the reason for the contact and not accused of committing the reported crime once they provided a satisfactory answer as to their presence. The request for identification was appropriate and no identification documents of the defendants were obtained and held for any period of time."

Ultimately the court held "under the totality of the circumstances, the court finds that the officers' actions did not amount to an unlawful detention prior to learning of a valid basis to conduct a search of the vehicle which led to the arrest of the defendants." Consequently, the trial court denied the motion to suppress.

5.

## DISCUSSION

## The Motion to Suppress Was Properly Denied

The parties agree the officers had no reasonable suspicion to detain defendants prior to conducting the parole search. Thus, the question presented is whether the officers detained defendants. We will, therefore, focus on that issue.

The standard we apply in reviewing the denial of a motion to suppress is well established. "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

> "Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)

A person has been detained when, in the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. (*United States v. Mendenhall* (1980) 446 U.S. 544, 554 (*Mendenhall*).) "The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred. [Citation.]" (*Manuel G.*, *supra*, 16 Cal.4th at p. 821.)

"Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.]" (*Manuel G.*, *supra*, 16 Cal.4th at p. 821.) An officer does not need to have a reasonable suspicion in order to ask questions or request identification. (*INS v. Delgado* (1984) 466 U.S. 210, 216; *People v. Lopez* (1989) 212 Cal.App.3d 289, 291.)

"The United States Supreme Court has made it clear that a detention does not occur when a police officer merely approaches an individual on the street and asks a few questions. [Citation.] As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur. [Citations.] '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*Manuel G.*, *supra*, 16 Cal.4th at p. 821.)

"The test for the existence of a show of authority is an objective one and does not take into account the perceptions of the particular person involved. [Citation.] The test is 'not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.' [Citation.]" (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1106.)

Relying on *People v. Garry*, defendants contend they were detained and not free to leave. Defendants argue a detention occurred because the officers engaged in an "aggressive" display of authority by spotlighting defendants' vehicle, approaching either side of the vehicle, and questioning defendants. We find *Garry* distinguishable.

In *Garry*, an officer briefly observed the defendant from his marked patrol vehicle late at night, and then "bathed" him in light from the patrol vehicle's spotlight. (*People v. Garry*, *supra*, 156 Cal.App.4th at p. 1111.) Armed and in full uniform, the officer walked "briskly" toward the defendant, covering a distance of 35 feet in two and a half to three seconds while questioning him. (*Id.* at p. 1104.) Upon seeing the officer, the defendant backed away and spontaneously stated, "'I live right there'" while pointing to a house. (*Ibid.*) The officer replied "'Okay, I just want to confirm that" and asked the

7.

defendant if he was on probation or parole. (*Ibid.*) Defendant replied he was on parole, and the officer detained him.

The Court of Appeal found the officer's actions constituted a detention. (*People v. Garry*, *supra*, 156 Cal.App.4th at p. 1111.) The combination of the use of the spotlight, the immediate exit from his patrol car, and the rapid approach toward the defendant while questioning him about his legal status, "constituted a show of authority so intimidating as to communicate to any reasonable person that he or she was '"not free to decline [his] requests or otherwise terminate the encounter."'" (*Id.* at p. 1112.)

Defendants argue the officers here made an even more aggressive approach than in *Garry*, thereby communicating to defendants they were not free to leave. Defendants emphasize the fact the officer described his action as making a "quick" turn. They compare this language to the officer's "brisk" approach while pointedly inquiring about the defendant's legal status in *Garry*. (*People v. Garry*, *supra*, 156 Cal.App.4th at p. 1112.) We disagree.

We find the officers' approach here was neither aggressive nor intimidating. It was undisputed the officer was some 50 to 100 feet away when he initially illuminated defendants' vehicle. The officer had previously testified he was driving substantially slower than the 25-mile-per-hour speed limit. He subsequently made a "quick" right turn and then an immediate U-turn in order to position his patrol vehicle behind defendants' vehicle. Defendants argue this maneuver constituted an aggressive approach. We are unpersuaded.

Officers Barthelmes and King did not approach defendants in the same manner as the officer did in *Garry*. Although the officer described his turn as "quick," this term does not always mean fast. Here it appears the officer used the term as describing the spatial rather than temporal proximity. Indeed, when describing his turn, Barthelmes was using a laser pointer to demonstrate his actions on an exhibit. We do not have the benefit of that demonstration as the parties did not indicate for the record the movements the officer made. However, it is apparent from the exhibits introduced into evidence that the

8.

officer spotted defendants' vehicle only a short distance from the area where he turned. Furthermore, it is apparent Valentine Street terminated at Hughes Lane, requiring the officers to turn onto Hughes. Considering this fact makes the approach even less aggressive. In context, the term "quick" as used here, meant "immediate." Indeed, when questioned further about making this "quick" turn, the officer explained the turn was "slow, but it was quick." This comports with the officer's earlier testimony that he was driving substantially below the 25-mile-per-hour speed limit as he traveled through the neighborhood. Thus, we conclude the vehicle's maneuver as it parked behind defendants' vehicle was not an "aggressive" one.

Nor do we find the officers' approach on foot intimidating. After positioning their patrol vehicle some 10 to 15 feet behind defendants' already parked car, Officer Barthelmes took the time to reposition his spotlight on the interior of the vehicle and to radio their location and defendants' license plate number to dispatch. The officers subsequently approached defendants' vehicle. There was no evidence the approach on foot was anything other than normal walking speed. Thus, the approach itself was not intimidating and not comparable to the officer's approach in *Garry*.

After spotlighting the defendant, the officer in *Garry* exited his car and walked "briskly" toward the defendant. He covered a distance of 35 feet in a matter of two and a half to three seconds while asking the defendant about his legal status. Indeed, the court noted the officer "all but ran" toward the defendant. (*People v. Garry*, *supra*, 156 Cal.App.4th at p. 1112.) Unlike *Garry*, the officers here simply drove toward defendants, albeit while shining a spotlight at the vehicle, and positioned their patrol vehicle behind them. The officers did not drive quickly toward the defendants, nor did they rush from their patrol car and question defendants before reaching the vehicle. The facts here are significantly different from *Garry*.

The trial court here found "nothing in the evidence to suggest the officers approached in an intimidating fashion or that the contact thereafter was not cordial." While defendants contend this finding was unsupported by the evidence, we disagree.

9.

Unlike *Garry*, no testimony established the amount of time the officers took to position their patrol vehicle behind defendants or to approach their car on foot. Nothing indicated the officers proceeded at an unusually fast speed. And unlike *Garry*, the officers did not inquire as to defendants' legal status while walking toward them. To the contrary, as previously noted, the officers took the time to radio dispatch before exiting their vehicle. Additionally, they asked defendants what they were doing, explained the report of loud music, and asked defendants to identify themselves before inquiring into their legal status. These very significant factual differences distinguish this case from *Garry*. The trial court's conclusion the officers approached in a nonintimidating fashion is supported by the record.

Nor do we agree with defendants' assertion they were trapped inside their vehicle by the officers.

Barthelmes testified he approached the "drivers' side" while King approached the "passenger's side" of the vehicle. The testimony was never specific as to the exact location the officers stood. At one point, Soto's counsel inquired whether Barthelmes stood "by the driver's side window" while King conducted the records check. Barthelmes agreed. However, this reference alone does not lead to the conclusion the officers blocked defendants' ability to exit the vehicle if they so chose.

*Garry* may also be distinguished on the ground defendants were sitting in a parked vehicle at the time of the police contact. This fact makes the case more similar to *People v. Perez* (1989) 211 Cal.App.3d 1492. There, an officer spotted a car parked in a dark corner of a motel parking lot with two occupants inside. The officer drove his patrol vehicle to the car and activated his spotlights and high beam headlights to look at the passengers and gauge their reaction. (*Id*. at p. 1494.) The occupants were slouched over and did not respond to the lights. At that point, the officer approached, knocked on the window, and observed the defendant speaking in slurred speech through the window. The officer smelled the odor of marijuana and subsequently determined the defendant was under the influence of a controlled substance. (*Id*. at p. 1495.)

10.

The court determined the officer's initial conduct in parking in front of the defendant's car with enough room for the defendant to leave if he so chose, as well as activating his high beam headlights and spotlights, did not amount to a detention. (*People v. Perez*, *supra*, 211 Cal.App.3d at p. 1496; see also *People v. Banks* (1990) 217 Cal.App.3d 1358, 1362 [police action of stopping behind a clearly parked car does not amount to a detention].) The court explained that while "the use of high beams and spotlights might cause a reasonable person to feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention." (*People v. Perez*, *supra*, at p. 1496.) Like the situation found in *Perez*, the officers here simply illuminated defendants' already parked vehicle without blocking defendants' path. Indeed, the officers use of a spotlight is significantly less intimidating here, as the officers parked behind rather than in front of defendants, and used a single spotlight and a hand-held flashlight rather than multiple spotlights in addition to high beam headlights.

We also find the recent case of *People v. Brown* (2014) 226 Cal.App.4th 142, petition for review filed June 17, 2014, instructive. There, the court held that activating *emergency* lights behind an already stopped vehicle did not amount to a detention. (*Id.* at pp. 144-145.) In *Brown*, an officer received a report of a fight taking place in an alley with the possibility of a gun being present. The officer responded to the location and saw no one except the defendant driving from the alley. The officer asked the defendant if he had seen a fight, but the defendant did not respond and continued driving from the alley. The officer turned around and followed the defendant, finding him parked alongside the road. The officer pulled in behind the defendant and activated his emergency lights. He subsequently approached and noticed signs the defendant was intoxicated. (*Id.* at p. 145.)

The appellate court held the defendant was not detained at the point the officer activated his emergency lights. In arriving at this conclusion, the court disagreed with the opinion in *People v. Bailey* (1985) 176 Cal.App.3d 402 that the mere display of emergency lights to an already stopped car constituted a detention. (*People v. Brown*, *supra*, 226 Cal.App.4th at p. 149.) Rather, as *Brown* noted, a detention not only requires

11.

a show of authority, but also a submission to that show of authority. Relying on *California v. Hodari D.* (1991) 499 U.S. 621, the court explained a showing of authority does not lead to a detention where the defendant does not submit to the showing. As the defendant's car in *Brown* was already stopped at the time the officer pulled up behind it and activated his emergency lights, there was no detention at that time. It was not until after the officer approached the car and noticed the signs of intoxication that the defendant was detained. (*People v. Brown*, *supra*, at p. 151.)

The use of a spotlight was also discussed in *People v. Franklin* (1987) 192 Cal.App.3d 935, where an officer spotlighted the defendant whom he observed wearing a full-length coat on a warm summer evening. (*Id.* at p. 938.) The defendant was carrying an object that he appeared to conceal from the light. The officer pulled over his car and radioed dispatch that he was making a pedestrian stop. Meanwhile, the defendant approached the patrol car. The officer exited and met the defendant in the area of the headlights of the patrol car while the defendant repeatedly asked "'What's going on?'" (*Id.* at p. 938.) During the encounter, the officer asked the defendant to remove his hands from his pockets. (*Ibid.*)

The court found the defendant was not detained during the encounter. Specifically, the court noted the act of spotlighting the defendant in addition to immediately pulling the patrol car to the curb behind the defendant was insufficient to cause a reasonable man to believe he was not free to leave. (*People v. Franklin*, *supra*, 192 Cal.App.3d at p. 940.) Importantly, the officer never blocked the defendant's path, nor did he immediately exit his patrol car and pursue the defendant. The court found the defendant's approach toward the officer was a voluntary act rather than a submission to a show of authority. (*Ibid.*)

Additionally, in considering the officer's request to the defendant to remove his hands from his pockets, the court noted it is "not the nature of the question or request made by the authorities, but rather the manner or mode in which it is put to the citizen that guides us in deciding whether compliance was voluntary or not." (*People v.*

*Franklin*, *supra*, 192 Cal.App.3d at p. 941.) Because the only evidence adduced at the motion to suppress indicated the officer *asked* rather than demanded the defendant remove his hands, it could not reasonably be considered a show of authority. (*Id*. at pp. 941-942.) Thus the court concluded the defendant had not been detained prior to that point. (*Ibid*.)

Similarly here, the officers simply used a spotlight to illuminate defendants and never blocked their path. Additionally, the officers did not immediately exit their patrol vehicle; rather they took the time to radio both their location and defendants' license plate number to the dispatcher. Although the officers approached defendants rather than defendants approaching the officers, as we have already discussed, the approach itself was not aggressive or intimidating. Furthermore, the record established the officers *asked* defendants questions rather than demanded information from them. Thus, the case is quite similar to *Franklin*.

In *People v. Rico* (1979) 97 Cal.App.3d 124, an officer's brief use of a spotlight to illuminate passengers in a vehicle on the freeway was not deemed to constitute a show of authority. After the officer shone the light on the vehicle, he followed the car for approximately five minutes. The driver then pulled the vehicle over to the shoulder of the freeway. The officer pulled in behind the car, parking five to six car lengths away and again activated his spotlights. (*Id*. at pp. 128-129.) The court found the officer's action of activating his spotlight on the vehicle while driving down the freeway was insufficient to support a finding that the motorist would have felt compelled to move over. (*Id*. at p. 130.) However, the officer's subsequent action of ordering the occupants from the vehicle converted the encounter into a detention. (*Id*. at pp. 130-131.)

Similarly here, the use of the spotlight did not constitute a detention. The officers did not spotlight defendants as they were driving but rather as they sat in their already parked vehicle. The officers initially illuminated the vehicle to determine if anyone was inside. This is similar to the use of the spotlight in *People v. Rico*. After seeing the car was occupied, the officers positioned their vehicle behind defendants' car and simply

13.

used the light to illuminate the interior of the vehicle while they made contact with defendants. Unlike *People v. Perez* where the officer shone spotlights and headlights into the front of the vehicle, likely blinding its occupants, the officers here used the spotlight in a much less intrusive manner. We conclude the use of the spotlight here did not constitute a detention.

Defendants also argue the fact the officers conducted a radio check was a factor in favor of finding a detention. On the issue of conducting a radio check, we find the case of *People v. Bouser* (1994) 26 Cal.App.4th 1280 instructive. There, the officer, who was in his patrol car, approached the defendant after observing him in an alleyway known for drug trafficking. The officer parked his vehicle and walked up to the defendant, who began walking away from the officer. The officer requested to speak with the defendant. The defendant stopped and allowed the officer to speak with him. The officer asked the defendant general information questions, such as his name, date of birth, and prior arrest history. (*Id.* at p. 1282.) The officer then used this information to fill out "a field interview card" and radioed to check for outstanding warrants. (*Ibid.*) He did not tell the defendant he was checking for warrants, but the defendant was close enough to hear the officer on his radio. The records check revealed an outstanding traffic warrant, which was relayed to the officer 10 minutes after his initial contact with the defendant. (*Id.* at p. 1283.)

The *Bouser* court surveyed an array of federal and state cases in answering the pivotal question of "whether the consensual encounter became a seizure when [the officer] commenced the warrant check over the radio." (*People v. Bouser*, *supra*, 26 Cal.App.4th at pp. 1284-1287.) Eschewing "a bright line rule," the court concluded that, under the totality of the circumstances, the check for outstanding warrants did not strip this encounter of its consensual character. (*Id.* at p. 1287.) In doing so, the court acknowledged "it is reasonable to presume the check alerted Bouser he was somehow being investigated." And when considered in light of the officer's questioning, Bouser "reasonably may have felt the subject of general suspicion." (*Ibid.*) Nevertheless, the

court found it significant "neither the questioning nor the warrant check related to specific and identifiable criminal activity. Moreover, [the officer] did not order Bouser to do anything or *turn over anything to him to hold* while the brief check was completed. Nor did [the officer] draw his weapon, make any threatening gestures, or utilize his car's lights or siren." (*Ibid.*, italics added.)

Similarly here, the officers parked their vehicle behind defendants and approached, inquiring into their purpose in the area. During the discussion the officers asked defendants for their identification, and when they stated they had none, asked for their names and whether they were on probation or parole. The officers did not fill out field identification cards as in *Bouser*, they simply conducted a records check over the radio using the information defendants provided. Significantly, there is no evidence the officers ever ordered defendants to do anything, nor did they take any of defendants' possessions while conducting the records check.[3] (See *People v. Castaneda* (1995) 35 Cal.App.4th 1222 [retaining defendant's identification while conducting records check constitutes detention].)

Defendants assert the fact there were two officers present in this case indicates they were detained. It is true the presence of multiple officers can be a factor indicative of a detention. (*Mendenhall*, *supra*, 446 U.S. at p. 554 [one example of circumstance indicating seizure within meaning of Fourth Amendment is the "threatening presence of several officers"].) For example, in *People v. McKelvy* (1972) 23 Cal.App.3d 1027, four officers, all armed with either shotguns or carbines, spotlighted the defendant as he was walking, approached him, and asked for an object the defendant had placed in his pocket.

---

[3]Defendants assert there was a conflict in the evidence regarding whether the officers retained Perez's identification. We disagree. The uncontradicted testimony established Perez provided his name and date of birth to the officers. When Barthelmes was questioned as to whether he recalled taking Perez's identification, he replied in the negative. Although Perez's counsel repeated the question three times, the answer was consistent and no other evidence established Perez ever produced an identification card or that the officers retained any documentation.

15.

The court found the circumstances established a submission to a show of authority. As the court explained, under "these circumstances, no matter how politely the officer may have phrased his request for the object, it is apparent that defendant's compliance was in fact under compulsion." (*Id.* at p. 1034.)

Unlike *McKelvy*, the officers here did not have a threatening presence. While two officers were present, there was no evidence the officers used or displayed their weapons in any manner. Furthermore, although there were two officers present, there were also two defendants present. Thus, defendants were not outnumbered by the officers. Instead, it appeared each officer focused his attention on a single defendant. As defendants were not outnumbered by the officers, and it appears each officer was speaking to one defendant, we do not find this factor supports a finding the encounter became a detention. Several cases have found no detention in situations where there was more than one officer contacting the defendant. (See, e.g., *People v. Lopez* (1989) 212 Cal.App.3d 289 [an officer and a recruit contacted defendant]; *People v. Terrell* (1999) 69 Cal.App.4th 1246 [defendant and two others seated on a bench contacted by two officers]; *People v. Leath* (2013) 217 Cal.App.4th 344 [defendant contacted by two officers].)

Likewise, the fact the officers inquired as to why defendants were in the area, asked for identification, and ran a records check did not constitute a show of authority. It is well-established law that a mere request for identification does not automatically transform a consensual encounter into a detention. (Cf. *INS v. Delgado*, *supra*, 466 U.S. at p. 216 ["interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"]; *People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1370 ["mere request for identification does *not* transmogrify a contact into a Fourth Amendment seizure"]; *People v. Castaneda*, *supra*, 35 Cal.App.4th at p. 1227 [officer's request for identification "did not—by itself—escalate the encounter to a detention"]; *People v. Bouser*, *supra*, 26 Cal.App.4th 1280 [running records check does not convert consensual encounter into detention].) Moreover, the

16.

evidence established the officers *asked* defendants questions rather than gave them demands.

Additionally, none of the questions appeared to be accusatory in nature. In *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790-791, our Supreme Court explained merely approaching a defendant, identifying oneself as a peace officer and asking to speak with him does not constitute a detention. However, informing the defendant the officer is conducting a narcotics investigation and has information the defendant would be arriving with a large quantity of drugs changed "the entire complexion of the encounter," and the defendant "could not help but understand that at that point he was the focus of the officer's particularized suspicion." (*Id*. at p. 791.) Although the officers here informed defendants they had received a complaint of loud music in the area, nothing indicated the officers were accusing defendants of being the source of that complaint or that they disregarded Soto's explanation he was waiting for his girlfriend. Indeed, it does not appear the officers continued to question defendants any further as to the reason for their presence.

We find *People v. Lopez*, *supra*, 212 Cal.App.3d 289 similar to the present case. There, an officer along with a recruit spotted the defendant sitting on the hood of a car. The officer asked the defendant if it was his car, and he said no. The officer then asked several additional questions, finally asking the defendant if he had any identification. In response, the defendant handed his wallet to the recruit and, upon opening it, a bindle containing narcotics fell from the wallet. (*Id*. at p. 291.) The court concluded no detention occurred. The mere request for identification did not transform the consensual encounter into a detention.

The court noted that although accusatory questions can convert a consensual encounter into a detention, the questions asked here were insufficient to do so. The questions asked, while somewhat accusatory, were "brief, flip and most importantly, did not concern criminal activity." (*People v. Lopez, supra*, 212 Cal.App.3d at p. 293.) Contrasting the facts to those in *Wilson v. Superior Court* where the officers asked

17.

heavily accusatory questions regarding serious criminal conduct, the court concluded the totality of the circumstances did not compel the conclusion the defendant was detained.

Similarly here, it does not appear the officers posed any accusatory questions. Although they mentioned there had been a complaint of loud music in the area, they never accused defendants as being the source of the music. Indeed, the officers heard no loud music from defendants' car. The officers certainly never accused defendants of serious criminal conduct as in *Wilson v. Superior Court*. Furthermore, the officers gave no indication they found defendants' purported reason for being in the area unsatisfactory. Although the officers asked defendants for identification, and subsequently ran a records check, nothing indicated defendants were not free to terminate the encounter and leave during this time.

Considering the totality of the circumstances here, we conclude defendants were not detained by the officers. There was no indication the officers' parking behind defendants' vehicle or their approach on foot was aggressive or intimidating. And although the officers used a spotlight and flashlight throughout the three- to seven-minute encounter, the officers never blocked defendants' exit, employed any emergency lights, brandished any weapons, made any demands of defendants, physically restrained defendants in any way, or asked any accusatory or pointed questions regarding criminal behavior. The entire contact was relatively brief. While the officers' conduct may have caused defendants "to feel … the object of official scrutiny, such directed scrutiny does not amount to a detention." (*People v. Perez, supra*, 211 Cal.App.3d at p. 1496.) Consequently, we conclude the officers' actions did not constitute a show of authority sufficient to restrain defendants' liberty, and defendants were not detained.

Defendants also argue the trial court erred in finding the officers had a reasonable suspicion Soto was driving without a license, thereby justifying a detention. We need not determine whether the officers had a reasonable suspicion Soto was driving without a license because we find the entire contact up to the point where the officers learned of Perez's parole status and conducted the parole search was a consensual encounter. It is

18.

unclear whether the trial court found defendants were ever detained. Some of the language in the ruling indicates the court found a detention occurred. The court, however, ultimately determined "the officers' actions did not amount to an unlawful detention prior to learning of a valid basis to conduct a search of the vehicle which led to the arrest of the defendants." We need not resolve this question. In reviewing a motion to suppress, we consider the facts as found by the trial court and supported by the evidence. We then independently determine whether there was a violation of defendants' Fourth Amendment rights. (*People v. Franklin*, *supra*, 192 Cal.App.3d at p. 940.)

The trial court found the officers' approach was not intimidating and the contact was cordial. In addition, the officers did not accuse defendants of committing a crime and simply requested their identification. Under these facts, the act of conducting a records check did not transform the contact into a detention.[4] (*People v. Bouser*, *supra*, 26 Cal.App.4th at p. 1287.)

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
POOCHIGIAN, J.

---

[4]As we have concluded defendants were not detained prior to the parole search, we need not address the remaining issues.

19.